## SPRINGER LAND ASSOCIATION *v.* FORD.

APPEAL FROM THE SUPREME COURT OF THE TERRITORY OF NEW MEXICO.

No. 89. Argued November 5, 1897. — Decided December 13, 1897.

Section 1524 of the Compiled Laws of New Mexico providing for the creation of mechanics' liens for work done on land, required the contractor, in order to obtain the benefit of the act, to file for record "a claim containing a statement of his demands, after deducting all just credit and offset, with the name of the owner or reputed owner, if known, and also

the name of the person by whom he was employed, or to whom he furnished the materials." The claim duly filed by Ford was preceded by a title describing the Springer Land Association and others and the Maxwell Land Grant Company and others, as "owners or reputed owners"; and stated a demand for the sum of $17,634.27, as "the balance due and owing to the said Patrick P. Ford, by the aforesaid owners, or reputed owners; after deducting all just credits and offsets for excavating and embankments done and performed by him under a certain contract entered into by the said the Springer Land Association, a copy of which contract is hereto annexed and made a part of this claim of lien. As also for the further sum of three hundred and ninety dollars for excavating and hauling, ordered by the engineer in charge of said ditch, and allowed by him in pursuance of the provisions of said contract"; and it stated when the work was commenced and when it was finished, and that on the last date it was "completed and accepted." It gave the names of the reputed owners of the land as the Maxwell Land Grant Company and others, enumerating them, trustees of that company; and alleged that claimant "was employed to do the said work by the Springer Land Association, C. N. Barnes, general manager, approved by C. C. Strawn as president." And it added that "the terms, time given and conditions of said contract are those that fully appear in the copy of the said contract which is attached hereto and made a part hereof." *Held*, that this claim of lien was sufficient under the statute in respect of all these particulars.

As between the parties the fact that a lien is claimed for a greater sum than is actually owing, or is actually covered by the lien, does not vitiate the claim when honestly made; and under the findings it is impossible to impute bad faith in this instance.

The findings show that Ford carried out the conditions of the contract by him to be kept and performed; that he made no objection to the deed, and would have been willing to receive it, but for appellants' failure on their part; and they cannot now be allowed to insist that Ford should be required to accept what they have not indicated a willingness or readiness to deliver; still less that the lien should be held invalidated because Ford did not credit $8000 for land never conveyed to him.

To limit the land upon which the lien was given to the strip of land sixty feet in width and twenty-six miles long, which was actually occupied by the ditch, and exclude the tract which the ditch was constructed to benefit by its continuous operation, would be to unreasonably circumscribe the meaning of the statute.

As the Supreme Court expressly found that it appeared "by the admissions in the pleadings and from the testimony that the 22,000 acres of land outside the ditches and reservoirs and the right of way for the same were appurtenant to said ditch and reservoirs and were under said ditch and to be irrigated thereby," it cannot now be urged that the description was void for uncertainty or that the decree included more land than was connected with the ditch.

THIS was a bill filed by Patrick P. Ford against the Springer Land Association and others in the District Court of New Mexico for the county of Colfax, to foreclose a mechanic's lien upon an irrigating ditch and reservoir system; the land covered thereby; the right of way therefor; and the particular lands intended to be irrigated. A cross bill was filed by the Springer Land Association and other defendants. The cause was heard on pleadings and proofs, and on findings of fact and conclusions of law duly made and filed, the District Court entered a decree in favor of Ford, adjudging a lien for the sum of $22,097.75, with interest and costs, on the ditch and reservoirs in question, together with the right of way, specifically describing them, and also on twenty-two thousand acres of land appurtenant to the ditch and to be irrigated thereby, specifying forty-six sections in four designated townships.

It was further decreed that the Springer Land Association and other defendants pay or cause to be paid the sum found due with interest and costs, (three thousand dollars thereof to be paid to the clerk of the court,) within ninety days, and in case of default that the property be sold by a special master and the proceeds distributed as prescribed, three thousand dollars to be retained by the clerk of the court to await the determination of a suit by Dargel, a subcontractor, to recover the amount of $2279.30, with interest and costs, or its payment and discharge by Ford. If a surplus was realized at the sale it was to be held subject to the further order of the court; if a deficiency resulted, the amount was to be reported by the master to the court.

The case was carried to the Supreme Court of the Territory, which found the facts, in substance, to be these:

On October 26, 1888, the Springer Land Association entered into a contract with Patrick P. Ford for the grading work in the construction of a certain ditch line and reservoir system for irrigation in Colfax County, New Mexico, which contract and the specifications forming part of it were set forth at length.

The contract provided: " The party of the first part agrees to furnish all necessary tools and labor, and perform all the

work of grading required in the construction of the Cimarron ditch and its accessories. Said work to be done in a thorough and workmanlike manner, and in full accordance with the specifications hereto attached and made a part of this contract. Said first party agrees to begin work within ten days after signing this contract, and to complete the same on or before July 1, 1889. The party of the second part agrees to pay said first party for work so done at the rate of eleven cents per cubic yard, without classification. And the amounts due for said work shall be paid at the time and in the manner described in the specifications hereto attached."

Specification 11 related to allowance for extra work when done under the orders of the engineer.

Specifications 13 and 15 were:

"13. Subcontracts. — Subcontracts must be submitted to the engineer, and receive his approval, before work is begun under them. No second subcontractor will be allowed. Subcontractors will be bound by the same specifications as the contractor, and will be equally under the authority of the engineer."

"15. Estimates. — On or about the first day of each current month, the engineer will measure and compute the quantity of material moved by the contractor during the preceding month; he will certify the amount to the company, together with an account of the same at the price stipulated, which amount will be audited by the company without unnecessary delay, and the amount thereof, less ten (10) per centum retained, will be paid to the contractor in cash within ten days thereafter. This retained percentage will be held by the company as a guarantee for the faithful completion of the work, and will be paid in full with the final estimate upon the certificate of the engineer accepting and approving the work, it being expressly understood that the failure of the contractor to fulfil his obligations will work a forfeiture of this retained percentage to the company. The amount due to the contractor under the final estimate, will only be paid upon satisfactory showing that the work is free from all danger from liens or claims of any kind, through failure on his part to liquidate his just indebtedness as connected with this work."

" Previous to the making of the last mentioned contract and on May 1, 1888, the Maxwell Land Grant Company made a contract with C. C. Strawn and associates, who afterwards organized the Springer Land Association, which succeeded to their rights and obligations, by which the Maxwell Company gave to them a right of way for the proposed irrigation system of ditches and reservoirs, and by which said agreement it was, among other things, provided that with the view of selling certain of its lands at an enhanced value, and in consideration of certain perpetual water rights and franchises, to be granted to it by the other party, it agreed to set apart and reserve from sale 22,000 acres of its lands, to be selected by the other party, and give to the other party a certain portion of the proceeds which might be derived from the sale of said lands when sold. These lands were under the proposed ditch system and to be irrigated by it, and by this agreement Strawn and his associates were to expend about sixty thousand dollars, or a sufficient sum, to complete the enterprise on the proposed plan." This contract was set forth *in extenso*.

" The title of the lands at that time and at all times afterwards was and remained in the Maxwell Land Grant Company, except as to the rights acquired by Strawn and associates and their successors in interest under said contract. The same contract constituted Strawn and his associates and successors in interest the agents of the Maxwell Company to the extent of and for the purpose of carrying into effect the spirit and intent of the contract as to the sale of the said lands, but that party, the Springer Land Association, had no other title in the lands than as given by said contract.

" Five days subsequent to the making of his grading contract complainant Ford entered into another contract with the Springer Land Association by which he agreed to select and accept one section of land under the proposed ditch system at the stipulated price of eight thousand dollars, to be taken as part payment on the contract price for Ford's grading work, by way of deduction of that sum from the final estimates on the contract for the construction of said ditch.

" The contract of May 1, 1888, designated one E. H. Kel-

logg as the engineer to have charge of the construction of
said system of ditches and reservoirs.   No engineer was named
in the contract between Ford and the Springer Land Asso-
ciation of October 26, 1888, but said Kellogg, with the assent
of all parties, acted throughout as the supervising engineer.

"Ford let subcontracts for portions of the work to McGar-
vey, Dargel and Haynes."

That with Dargel was given in full, and the three were of
like form and tenor and approved by the engineer.   Each con-
tained this clause: "It is mutually agreed that the amounts
of these sub-estimates will in no case be demanded or paid in
advance of the payment of the regular estimate."

Estimates, as provided by the contract of October 26, 1888,
were made by the supervising engineer from time to time,
which were audited and paid by the Springer Land Associa-
tion up to about May, 1889.

Estimate No. 6 was dated April 30, 1889, and showed the
amount then due and payable, after reserving ten per cent, to
be $5010.92.   The amount of this estimate has never been paid.

June 13, 1889, the engineer gave Ford a written acceptance
of the work and a final estimate, set forth at large in the
findings.   The total amount payable under the contract was
$48,553.56.   The six prior estimates aggregated $35,928.03,
and the last and final estimate was for $12,625.53, but as the
sixth estimate of $5010.92 had not been paid the total amount
due was $17,636.45.

"This amount the Springer Land Association refused to
audit and pay on the ground that the sum so stated was in
excess of the amount due; that the work had not been com-
pleted according to contract; that the engineer's final esti-
mate was erroneous either through fraud, inadvertence or
mistake, because the subcontractors had not been paid the
several sums due them on the work by Ford, and that the
property was not free from danger from liens, and also that
Ford should accept the section of land which he had agreed
to accept and which he had previously selected in payment
of $8000 of the amount of such final estimate.

"The Springer Land Association procured to be made and

properly executed a deed of conveyance by the Maxwell Land Grant Company, which held the title, to Patrick P. Ford, conveying to him the section of land which had been selected by said Ford, and had the said deed present in the hands of an agent of said Maxwell Company on June 19, 1889, when the representative of the Springer Land Association, said Ford, and his subcontractors met for final settlement; said deed to be delivered to said Ford upon payment to the agent of said Maxwell Company by the Springer Land Association of $4000. The representative of the Springer Land Association had with him at that time, for the purpose of making settlement with Ford, currency and valid checks on a responsible Chicago bank for $17,000. He notified said agent and Ford that he was ready to pay the $4000 to the agent of the Maxwell Company for the deed if Ford would settle with his subcontractors. Ford examined the deed and made no objection to it. McGarvey, one of the subcontractors then present, claimed that Ford owed him about $4000, which Ford disputed as to $300.00 of it. Ford would not settle unless McGarvey would accept the amount he admitted and give him a receipt in full, which McGarvey refused to do, and claimed that he had a lien on the ditch and reservoir for the amount of his claim. The agent of the Springer Land Association offered to pay the subcontractors directly if Ford would agree with them as to the amounts due them. No settlement was made between Ford and McGarvey. McGarvey then informed the agent of the Springer Land Association that the work was not done according to contract, upon which the latter disputed the correctness of the final estimate and ultimately refused to audit the same. The said disagreement between Ford and Subcontractor McGarvey was one of the reasons why the deed was not delivered to Ford. The representative of the Springer Land Association did not tender to the agent of the Maxwell Company the amount due it upon said deed, and that no sufficient tender of the deed was made to Ford to require him in law to accept it."

The sums claimed by the several subcontractors at that time amounted to $7537.72.

Thereupon, on July 3, 1889, complainant Ford filed his notice of claim of lien for $17,634.27 alleged to be due on the contract, including all moneys due subcontractors at that time; and $390.00 for extra work.

This claim asserted a lien on the ditch and right of way and the twenty-two thousand acres of land to secure the payment of said two sums according to the contract, a copy of which and of the specifications was attached to and made part of the claim; stated when the work was commenced, completed and accepted; made the Springer Land Association and others, and the Maxwell Land Grant Company and others, parties to the notice; gave the Maxwell Land Grant Company and others as the reputed owners; stated that claimant was employed to do the work "by the Springer Land Association, C. N. Barnes, general manager, approved by C. C. Strawn as president;" and that "the terms, time given and conditions of said contract are those that fully appear in the copy of the said contract which is attached hereto and made a part hereof." It was properly verified, duly filed and recorded, and action commenced within the statutory time.

McGarvey and Dargel, subcontractors, filed notices of liens and commenced suits, and Dargel's suit was pending at the date of the decree.

The findings continued:

"It appears by the admissions in the pleadings and from the testimony that the 22,000 acres of land outside of the ditches and reservoirs and the right of way for the same were appurtenant to said ditch and reservoirs — were under said ditch and to be irrigated thereby; that the same were included within the sections described in the notice of lien and bill of complaint. It does not appear that the particular sections described were selected or segregated by the Springer Land Association under its contract of May 1, 1888, as capable of irrigation, and it does appear that in a number of the said sections only portions of the section were selected, because a number of them were not flooded or situated so as to be overflowed with water or irrigated from the ditch. All of said

sections were situated between the line of said ditch and the river and were enhanced in value by reason of its construction.

"It appears that complainant Ford paid to his several subcontractors all amounts due them under the first five monthly estimates, but at the time of the commencement of this suit had not paid what was due them under the sixth estimate (May, 1889) nor under the final estimate of June 13, 1889."

It was also found that there was no collusion between Ford and the engineer as charged in the cross bill; that the acceptance by the engineer was conclusive, and the amount shown by his estimates correct.

The decree was affirmed, 41 Pac. Rep. 541, and an appeal was then taken to this court.

Errors were assigned as follows:

"1. That the claim or notice of lien, to foreclose which this suit was brought, was insufficient in law to create a lien.

"2. That the amount claimed and adjudged as a lien was excessive, and included claims not due or payable.

"3. That the final estimate was not payable by reason of the existence of liens of subcontractors.

"4. That defendant should be entitled to be credited with the sum of $8000 on the final estimate, on account of land which was to have been taken in payment thereon.

"5. That no lien attached to the land outside of the ditches, reservoirs and the right of way for the same."

The Compiled Laws of New Mexico, of 1884, Title 24, c. 1, contain these sections:

"§ 1519. A lien is a charge imposed upon specific property, by which it is made security for the performance of an act.

"§ 1520. Every person performing labor upon, or furnishing materials to be used in the construction, alteration or repair of any mining claim, building, wharf, bridge, ditch, flume, tunnel, fence, machinery, railroad, wagon road or aqueduct to create hydraulic power, or any other structure, or who performs labor in any mining claim, has a lien upon the same for the work or labor done or materials furnished by each, respectively, whether done or furnished at the instance of the

owner of the building, or other improvement or his agent; and every contractor, subcontractor, architect, builder or other person having charge of any mining, or of the construction, alteration or repair, either in whole or in part, of any building or other improvement, as aforesaid, shall be held to be the agent of the owner, for the purposes of this act."

"§ 1522. The land upon which any building, improvement or structure is constructed, together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien, if at the commencement of the work, or of the. furnishing the materials for the same, the land belonged to the person who caused said building, improvement or structure to be constructed, altered or repaired, but if such person owned less than a fee simple estate in such land, then only his interest therein is subject to such lien."

" § 1524. Every original contractor, within ninety days after the completion of his contract, and every person, save the original contractor, claiming the benefit of this act, must within sixty days after the completion of any building, improvement or structure, or after the completion of the alteration or repair thereof, or the performance of any labor in a mining claim, file for record with the county recorder of the county in which such property or some part thereof is situated, a claim containing a statement of his demands, after deducting all just credit and offset, with the name of the owner or reputed owner, if known, and also the name of the person by whom he was employed, or to whom he furnished the materials, with a statement of the terms, time given, and conditions of his contract, and also a description of the property to be charged with the lien, sufficient for identification, which claim must be verified by the oath of himself or of some other person."

" § 1526. The recorder must record the claim in a book kept by him for that purpose, which record must be indexed as deeds and other conveyances are required by law to be indexed; and for which he may receive the same fees as

are allowed by law for recording deeds and other instruments."

"§ 1529. Every building or other improvement mentioned in section 1520, constructed upon any lands with the knowledge of the owner or the person having or claiming any interest therein, shall be held to have been constructed at the instance of such owner or person having or claiming any interest therein, and the interest owned or claimed shall be subject to any lien filed in accordance with the provisions of this act; unless such owner or person having or claiming an interest therein shall, within three days after he shall have obtained knowledge of the construction, alteration or repair, or the intended construction, alteration or repair, give notice that he will not be responsible for the same, by posting a notice in writing to the effect, in some conspicuous place upon said land, or upon the building or other improvement situated thereon.

"§ 1530. The contractor shall be entitled to recover upon a lien filed by him only such amount as may be due to him according to the terms of his contract, after deducting all claims of subcontractors under him who have filed liens for work done and materials furnished, as aforesaid, and in all cases where a lien shall be filed, under this act for work done or materials furnished to any contractor, he shall defend any action brought thereupon at his own expense ; and during the pendency of such action the owner may withhold from the contractor the amount of money for which lien is filed, and in case of judgment against the owner, or his property, upon the lien, the said owner shall be entitled to deduct from any amount due, or to become due, by him to the contractor the amount of such judgment and costs; and if the amount of such judgment and costs shall exceed the amount due by him to the contractor, or if the owner shall have settled with the contractor in full, he shall be entitled to recover back from the contractor any amount so paid by him, the said owner, in excess of the contract price, and for which the contractor was originally the party liable."

*Mr. Frank Springer* for appellants.

*Mr. Joel F. Vaile* for appellee. *Mr. Edward O. Wolcott, Mr. Charles W. Waterman* and *Mr. William W. Field* were on his brief.

Mr. Chief Justice Fuller, after stating the case, delivered the opinion of the court.

Although mechanics' liens are the creation of statute, the legislation being remedial should be so construed as to effectuate its object. *Davis* v. *Alvord*, 94 U. S. 545; *Mining Co.* v. *Cullins*, 104 U. S. 176.

Substantial compliance, in good faith, with the requirements of the particular law is sufficient, and the test of such compliance is to be found in the statute itself.

These enactments vary in the different States and Territories, and to the variance in their terms, judicial decisions necessarily conform.

Section 1524 of the Compiled Laws of New Mexico required the contractor, in order to obtain the benefit of the act, to file for record " a. claim containing a statement of his demands, after deducting all just credit and offset, with the name of the owner or reputed owner, if known, and also the name of the person by whom he was employed, or to whom he furnished the materials."

The claim duly filed by Ford was preceded by a title describing the Springer Land Association and others and the Maxwell Land Grant Company and others, as "owners or reputed owners;" and stated a demand for the sum of $17,634.27, as "the balance due and owing to the said Patrick P. Ford, by the aforesaid owners, or reputed owners, after deducting all just credits and offsets for excavating and embankments done and performed by him under a certain contract entered into by the said Springer Land Association, a copy of which contract is hereto annexed and made a part of this claim of lien. As also for the further sum of three hundred and ninety dollars ($390) for excavating and hauling, ordered by the engineer in charge of said ditch, and allowed by him in pursuance of the provisions of said contract;" and

it stated when the work was commenced and when it was finished, and that on the last date it was "completed and accepted." It gave the names of the reputed owners of the land as the Maxwell Land Grant Company and others, enumerating them, trustees of that company; and alleged that claimant "was employed to do the said work by the Springer Land Association, C. N. Barnes, general manager, approved by C. C. Strawn as president." And it added that "the terms, time given and conditions of said contract are those that fully appear in the copy of the said contract which is attached hereto and made a part hereof."

We entirely agree with the Supreme Court of the Territory that this claim of lien was sufficient under the statute in respect of all these particulars. It is attacked by counsel for appellants because containing "no statement of the amount of work done; nor of the payments made; nor the estimate or acceptance by the engineer;" and also because "erroneous as to the party from whom due." But this statute did not require, as many such statutes do, "a just and true account," or "a full and true account" of the details of the transaction, and this work was done under a special contract, at so much per cubic yard, to be paid for on engineer's certificates. In our judgment Ford's statement of his demands, with the copy of the contract and specifications annexed, was in reasonable and adequate compliance with the statute.

As to the name of the person by whom Ford was employed, the claim was specific; and the names of the owners or reputed owners of the lands, and their connection with the transaction, were also given with sufficient clearness. With reference to similar statutory provisions, the Supreme Court of California in *Davies Henderson Lumber Co.* v. *Gottschalk,* 81 California, 641, 646, said: "There is nothing in the section, or any other, that requires the material-man to state in his claim of lien what relation the person to whom he furnished the material bore to the owner, whether contractor or agent; nor does the burden of determining whether any contract made, or attempted to be made, between the owner and contractor, was valid or not, rest on him when he comes to file

his lien. He must state the facts required by the statute. Whether the person to whom he furnished the material had authority to bind the owner, and entitle the material-man to a lien, is a matter of pleading and proof at the trial." And in *Jewell* v. *McKay*, 82 California, 144, it was held that it was not even necessary that the notice of lien should state that the owner of the land had knowledge of the work.

By section 1520 of this statute a lien is given for work or labor done at the instance of the owner of the improvement " or his agent;" by section 1529 it is provided that every improvement " constructed upon any lands with the knowledge of the owner or the person having or claiming any interest therein, shall be held to have been constructed at the instance of such owner or person having or claiming any interest therein," unless he shall give notice that he will not be responsible for the same; and by section 1522, the land upon which any improvement is constructed, " together with a convenient space about the same," is also subject to the lien if at the commencement of the work it belonged to the person who caused the improvement to be constructed.

The contract of May, 1888, between the Maxwell Land Grant Company and 'those who afterwards constituted the Springer Land Association was entered into for the construction of this irrigating system, and it expressly made the Springer Land Association " the agent of the Maxwell Land Grant Company," with power to do all acts necessary to carry out the proposed improvement, and to sell and dispose of the lands designed to be benefited thereby; and the findings of the Supreme Court were to the effect that the Maxwell Land Grant Company was the person at whose instance the improvement was made, and knew at the time that the work was being carried on.

The courts below concurred in their findings that the amounts demanded were the amounts due, and the decree provided for the payment of the only outstanding claim of a subcontractor. But it is urged that the aggregate claimed in the notice of lien was so excessive as to invalidate the lien in whole or in part.

We do not understand that as between the parties the fact that a lien is claimed for a greater sum than is actually owing, or is actually covered by the lien, vitiates the claim when honestly made; and under the findings it is impossible to impute bad faith in this instance.

The contract contained this provision: "The amount due to the contractor under the final estimate will only be paid upon satisfactory showing that the work is free from all danger of lien or claims of all kinds, through failure on his part to liquidate his just indebtedness as connected with this work."

And it is said that "the final estimate of $12,625.53 was not yet due," in that the subcontractors had not been paid in full, and the work, therefore, was not free from all danger of liens. The findings show, however, that by the contracts between Ford and his subcontractors, approved by the supervising engineer, the amounts due the subcontractors, on monthly sub-estimates, were in no case to "be demanded or paid in advance of the payment of the regular estimate;" that Ford on payment of the regular estimates had paid his subcontractors in full; and that the sub-estimates for May and the final sub-estimates had not been paid because appellants had not paid Ford his May and final estimates under their contract with him. The May estimate due him was for $5010.43, and the balance of $12,625.53 contained nearly $4000 of retained percentage, being ten per cent of the amount due for work done up to the time the May estimate was issued; while the amounts claimed by the subcontractors on the completion of the work aggregated $7537.72. It is quite clear that if there were any danger from liens or claims of any kind, this was not "through failure on his part to liquidate his just indebtedness as connected with this work," but solely by reason of the failure to pay him according to the terms of the contract. And it should be noted that the correctness of Ford's claim does not appear to have been questioned until the nineteenth of June, 1889, when one of the subcontractors having become involved in a dispute with Ford over the sum of $300, suggested to the Springer Land Association that the work had not been done according to the con-

tract, a suggestion which the findings show was without foundation.

Appellants' counsel further contended that the lien was excessive because appellants were entitled to a credit of $8000 for land which Ford had agreed to accept in part payment of the final estimate.

At the conference, on the 19th of June, 1889, between the agents of the Maxwell Land Grant Company and of the Springer Land Association, Ford, and the subcontractors, the Maxwell agent had in his possession a deed conveying a section of land to Ford, which he notified the Springer agent he was ready to deliver upon the payment of $4000 by the Springer Land Association. The Springer agent responded that he was willing to pay the $4000 if Ford would settle with the subcontractors, but he did not perform the condition and accept the deed. Nor was any tender of the deed made to Ford, who was simply informed that if he would, compulsorily, do that which the default of the Springer Company had theretofore rendered impracticable, then the Springer agent would obtain the deed for delivery to Ford. Nor did it appear that since that day there had been any offer to deliver, or a declaration of a willingness to deliver, the deed. The findings show that Ford carried out the conditions of the contract by him to be kept and performed; that he made no objection to the deed, and would have been willing to receive it, but for appellants' failure on their part; and they cannot now be allowed to insist that Ford should be required to accept what they have not indicated a willingness or readiness to deliver; still less that the lien should be held invalidated because Ford did not credit $8000 for land never conveyed to him.

Finally it is objected that the demand of $390 for extra work rendered the entire claim of lien inefficacious, but it is obvious that this was not an overstatement which could have that effect. Though there is no specific finding by the Supreme Court in reference to this item, the findings of the District Court show that the extra work was performed under the direction of the engineer, and that the bills therefor were approved by him to an amount exceeding this minor demand,

which under the specifications appellants were bound to pay. It was properly included in the notice of lien, and, being manifestly due, the decree ought not to be reversed or even modified, because it formed part of the amount decreed.

The last error assigned is that no lien attached to the land outside of the ditches, reservoirs and the right of way to the same.

The statute gave a lien for labor performed or materials furnished in the construction of ditches, not only on the ditch and the land through which it was constructed, but on so much of the land about the same as might be required for its use, "to be determined by the court on rendering judgment."

This tract of 22,000 acres was the tract for whose irrigation the ditch was constructed and by which it was to be benefited. The ditch and the land were inseparably connected as parts of the common enterprise, and to sever the ditch from the land would render the ditch practically valueless. The claim of lien stated, the bill in this case averred and the answer admitted, that Ford contracted to perform the work of grading required in the construction of the Cimarron Ditch and its accessories, the ditch being situated as described; and "that the said ditch has and appurtenant thereto along its entire length, land as passageway about sixty feet in width; as also lateral ditches and reservoirs, and the land covered thereby, and also appurtenant to said ditch, twenty-two thousand acres of land in said county, and under said ditch, and to be irrigated thereby, and described as follows," namely, certain sections enumerated.

The contract with the Maxwell Land Grant Company showed that it caused the improvement to be made for the purpose of supplying water to the entire acreage under the ditch, and in consideration of the construction of the improvement, gave to the Springer Land Association an interest in the 22,000 acre tract. The improvement was projected and constructed upon the property as an entirety, though the contract contemplated that after its completion the tract should be cut up and sold in small holdings, the Maxwell Company manifestly causing the improvement to be made for the express purpose of rendering the land salable.

To limit the land upon which the lien was given to the strip of land sixty feet in width and twenty-six miles long, which was actually occupied by the ditch, and exclude the tract which the ditch was constructed to benefit by its continuous operation, would, it seems to us, be to unreasonably circumscribe the meaning of the statute. And appellants' pleading not only admitted that all of the 22,000 acre tract was appurtenant to the improvement and benefited by it; but the courts of New Mexico distinctly found this to be so, and that the tract was necessary to the convenient use of the improvement for the purposes contemplated in its construction.

The truth is that what area of land is subject to lien in a given case largely depends on the character of the improvement. The extent of ground proper and necessary to the enjoyment of a building, a wall, or a fence, would not be the same as that required for or appertaining to an irrigation system, but the principle of determination is the same.

This ditch was to expend its waters on this tract and could not be used or operated without it. Each was dependent on the other, and both were bound together in the accomplishment of a common purpose. The lien must apply to the entire tract or be confined to the right of way through which it took its course, and to narrow it down to the latter would be to disregard the very terms of the statute.

Appellants admitted the tract to appertain to the ditch and the Supreme Court so found, and that it was required for the use and operation thereof. We perceive no adequate ground for declining to accept that conclusion.

The description of the land was by sections and townships, and forty-six sections were enumerated. As the sections, if full, would contain 29,440 acres, and as the enterprise embraced 22,000 acres — though it was estimated by the Maxwell contract that the ultimate capacity of the ditch might be adequate to the irrigation of 30,000 acres — it is insisted that the description was void for uncertainty or that the decree was erroneous as including more land than could on any theory be held to appertain to the ditch. But a Congres-

sional township of thirty-six sections does not necessarily contain thirty-six times six hundred and forty acres; and subdivision fifth of section 2395 of the Revised Statutes provides: "Where the exterior lines of the townships which may be subdivided into sections or half sections exceed, or do not exceed six miles, the excess or deficiency shall be specially noted, and added to or deducted from the western and northern ranges of sections or half sections in such township, according as the error may be in running the lines from east to west, or from north to south."

The Supreme Court pointed out that sixteen of these sections were bounded by the northern and western lines, and held that the court might as well presume that the alleged discrepancy was accounted for by a deficiency in the government surveys, as that the forty-six sections contained the full quantity. And it should be remembered that the acreage occupied by the ditch, the lateral ditches and reservoirs must have been considerable.

Again, as the Supreme Court said, quantity in description must yield to definite description by metes and bounds, or by name and number. Quantity may aid but cannot control such description.

The claim of lien, after describing the ditch, its accessories, and right of way, and the 22,000 acres, added, " all of which ditch, laterals and reservoirs and lands as aforesaid are plotted and laid out on the plan hereto attached and made a part of this claim of lien." This was so stated in the bill and admitted in the answer.

While one of the findings is somewhat obscure, and, standing alone, might create a doubt as to the identification of the particular tract, yet the findings taken together and in connection with the plat evidently made this certain; and as the correctness of the description and acreage was admitted, any contention in this regard comes too late.

The Supreme Court expressly found that it appeared " by the admissions in the pleadings and from the testimony that the 22,000 acres of land outside the ditches and reservoirs and the right of way for the same were appurtenant to said ditch and

reservoirs and were under said ditch and to be irrigated thereby."

We think it cannot now be urged that the description was void for uncertainty or that the decree included more land than was connected with the ditch.

*Decree affirmed.*