SALT LAKE HARDWARE CO. v. CHAINMAN MINING & ELECTRIC CO.

(Circuit Court, D. Nevada. April 28, 1905.)

No. 756.

1. MECHANIC'S LIEN—TIME FOR FILING—COMPLETION OF CONTRACT.
   Where complainant contracted to furnish machinery and material for a mill, and to install the same, the contract was not completed, so as to start the time for filing a mechanic's lien to running, so long as complainant's employés were engaged in work in the mill which was necessary in order to put the machinery and equipment in the condition required by the contract as originally made or as modified by subsequent agreements.

2. SAME—EXTRA MATERIALS.
   Extra machinery and materials furnished by a contractor for the equipment of a mill, and made necessary by changes in the specifications by the owner, are to be regarded as having been furnished under the original, and not under an independent, contract.

3. SAME—VALIDITY—ERROR IN STATEMENT.
   Mechanic's lien statutes are to be construed so as to effect substantial justice, and a lien will not be held void because the statement filed claimed more than was actually due, where it was the result of mistakes, and without fraud or wrongful intent.

   [Ed. Note.—For cases in point, see vol. 34, Cent. Dig. Mechanics' Liens, § 253.]

4. SAME—MINING PROPERTY SUBJECT TO LIEN—NEVADA STATUTE.
   Under Cutt. Comp. Laws Nev. § 3881 et seq., which gives a lien on a mine for labor or materials used in the construction of any building or superstructure thereon, and on a mill, manufactory, or hoisting works for machinery or labor furnished in its construction, and provides that the lien shall extend to "the land occupied by any building or other superstructure, * * * together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof," a contractor who furnished and installed the machinery and appliances for a mill at a mine is not entitled to a lien therefor on an electric power plant situated some miles from the mine on land not connected therewith, although power is supplied by such plant for the operation of the mill, but the lien therefor will extend to a group of mines constituting the mining property on which the mill is situated, and to reduce the ores from which it was built.

In Equity. Suit to establish and enforce a mechanic's lien. See 128 Fed. 509.

S. Summerfield and Charles C. Dey, for complainant.
Cheney & Massey, for defendant.

HAWLEY, District Judge (orally). This is a suit brought under the provisions of the mechanic's lien laws of Nevada (Cutt. Comp. Laws, § 3881 et seq.) to foreclose a mechanic's lien upon defendant's mill and mines situate in White Pine county, Nev. In its claim of lien the complainant states that on March 15, 1901, "this lien claimant and said Chainman Mining & Electric Company made and entered into a certain contract in writing, wherein and whereby this lien claimant agreed and undertook to furnish certain mill machinery and material, and construct and install the same into a mill for said Chainman Mining & Electric Company upon the premises

hereinafter described, and said Chainman Mining & Electric Company agreed to pay this lien claimant the sum of $50,097.50 therefor. That said contract specified the various articles of machinery and material to be furnished. * * * That acting under said contract, and pursuant to the terms thereof, and as a continuous part thereof, this claimant furnished said machinery and material to said Chainman Mining & Electric Company, and installed and constructed the same into a mill upon the mine of said company, * * * and during the progress of said work, and as a continuous part of the performance of said contract, furnished and installed in said mill, at said company's instance and request, extra material, machinery, and fixtures, not provided for or mentioned in said contract, of the aggregate value of $3,311.12. * * * Upon which indebtedness it has paid the sum of $41,751.28, leaving due, owing, and unpaid the sum of $11,657.34, with interest thereon at the rate of 8 per cent. per annum from July 31, 1902, after deducting all just credits and offsets. That the first of said material and work was furnished on the 22d day of May, 1901, and the last thereof on July 16, 1902." There are several separate and independent questions presented in the suit, which will be noticed under separate heads.

1. Was the lien of complainant filed within 60 days after the completion of the contract? When was the furnishing of the machinery and its installation in the mill completed? The claim on behalf of complainant is "that the last work was performed and material furnished on July 16, 1902." On behalf of defendant the claim is "that the contract of the complainant was completed in December, 1901, and at a date not later than May, 1902." This point presents some difference in the opinion of the respective parties as to when the contract should be considered as having been completed. The complainant, for the purpose of getting its money due on the contract, wrote several letters to the defendant, that the contract was practically completed in December, 1901. The defendant, for the purpose of delaying the payment of the money due, wrote letters in reply that the mill had not been completed, and that there were many things yet to be done. In a letter of March 14, 1902, complainant says:

"We finished, or practically finished, our contract in the latter part of November of last year, and the mill should have been started up at that time, making our last payment due on or about December 15th, but as we fully realized that you were making changes at that time in your management and were laboring under disadvantages, we did not push for a settlement, or even demand that you start up the mill and test the machinery to find if it was perfect, but left it open, waiting the arrival of Mr. Dunham."

Under date of March 19, 1902, complainant writes Mr. Dunham, "Mr. Weller writes us that you are about ready to start up the mill;" and in a letter to Mr. Dunham April 2, 1902, complainant says:

"Our Mr. Forbes calls my attention to a clause in one of your recent letters in which you refer to the contract payments not being due on account of the mill not having started. You possibly overlooked the fact that as soon as the machinery has been put in motion, that the mill is presumed to have started,

whether you put ore into it or not. Mr. Weller informs us that he has had every piece of machinery in the mill in operation. That being the case, the mill has started, and you must so consider it."

On the other hand, defendant, through its superintendent, Dunham, on May 28, 1902, wrote to complainant, "Your work has not all been completed by a good deal, and there are a number of things for you yet to complete;" and on June 12, 1902:

"We do not see how your contract for machinery and installation is finished until the tanks are made tight, the silver plates set, pumps and shafting installed in a workmanlike manner, one full set of screens furnished for each Chillian mill, turn-tables made over or new ones, so that the cars will run on them, the tailing cars should be put in line and made over so that it will not require three men and a horse to move them, the turn-tables are too small for the cars, and a car will not run on them until the guard-rail is cut off; we lack one set of screens to start the Chillian mills, the screens you sent are too small, and the set that came with the mills are broken. Mr. Weller is and has been working for you on the above incompleted work. Mr. Weller is installing one of the solution pumps now, up to today it would not run, neither pump is bolted down yet. The line shaft is not in line, and many details yet to be finished by you before we can possibly start the machinery to give the mill a test."

These letters—and there were many others of like import—establish the fact that the principal part of the contract in relation to the installation of the machinery was performed prior to January 1, 1902. But there were several other matters which the defendant claimed had to be done by complainant before the contract could be fully completed. The court must, therefore, look elsewhere to find other facts tending more clearly and directly to show just what was done. The allegation of the complaint is that the last work was performed and materials furnished on July 16, 1902. The answer avers:

"This defendant is informed and believes, and upon such information and belief alleges the facts to be, that said contract was completed on or before the 1st day of December, 1901."

As bearing on the actual belief and claim of the defendant, it is proper to notice the fact that in defendant's cross-bill it is averred:

"That by reason of the neglect and failure of said Salt Lake Hardware Company to complete said contract and said mill within the time specified in said contract, as hereinbefore alleged, your orator was unable during said time, for a period of eight months after said contract and said mill should have been completed, to operate its said mill," etc.

It further appears that in December, 1901, defendant changed its general manager and other officers theretofore employed by it, and the new officers made alterations in the plans and specifications hitherto adopted, which delayed the work on the mill. But, in addition to this, without further giving the details of the testimony, it affirmatively appears without any contradiction that Mr. Weller was working continuously for the complainant from June 3, 1902, up to July 16, 1902, lining up, boxing, calking tanks, setting pulleys, and doing sundry work arising in starting new machinery. It is, however, claimed that this work done by Weller was upon additional contracts made by the parties, and no part of the original contract. We will have occasion hereafter to show the agreement

made by the parties for the payment of extra work. Whether the work done by Weller at the dates last stated was necessary work under the contract or extra work seems immaterial. It was such work, as was stated by defendant's superintendent, necessary to be done in order to complete the contract. The work was done at defendant's request, and the right of lien attaches when the last work is done.

In New England Engineering Co. v. Oakwood St. Ry. Co. (C. C.) 75 Fed. 162, 168, an objection of a similar nature was made, which was overruled. The court said:

"The bill charges that the complainant, at the request of the defendant, operated the machinery after it had been started for a month, and also furnished during that month extra materials and extra labor, so that the last item for labor and materials furnished bears the date of the 29th of July, while the sworn and itemized statement of account was filed with the recorder on the 13th of August. It is very clear from these averments of the bill that the work under contract and that added by stipulation thereto were not completed until the 29th of July. The engine was started on the 1st or 2d of July, and from that time the complainant claims interest in accordance with the terms of the contract, which provides for the second $10,000 cash and the delivery of the notes when the machinery is started. I think it may be very doubtful whether the contract does not mean the starting of the machinery by the street railway company; but, whether this be true or not, it is certain that the work was not done and the materials were not furnished, all of them, within the meaning of the statute, until the 29th of July."

It was held in Perkins v. Boyd (Colo. App.) 65 Pac. 350, that where an agreement to furnish certain material and perform certain work is subsequently extended by other agreements, the time within which to file a mechanic's lien therefor commences to run from the date of the last work done under any of such agreements.

In Cary Hardware Co. v. McCarty, 10 Colo. App. 200, 215, 50 Pac. 744, the court, in discussing a similar question, said:

"The acts of plaintiffs in performing labor and furnishing materials all tended to the accomplishment of one purpose, viz., the construction of a smelting plant, and were practically continuous. All of the items in the account related to one transaction, and it was therefore a continuous account, the right to initiate a lien for which accrued from the date of the last item."

In McIntyre v. Trautner, 63 Cal. 429, the court said:

"As appears by plaintiff's testimony, * * * defendant, about the middle of February, objected that 'the job was not satisfactory, and that he would not accept'; * * * that 'the pipes leaked'; and requested plaintiff 'to go and put them into proper shape.' The leaking was stopped and the work perfected April 25, 1878. The lien was filed May 24, 1878. Defendant cannot be heard to say that the additional work done at his request to complete the contract was not a continuation of the previous work, and done under the same contract. The notice of lien was filed in time."

See, also, Skyrme v. Occidental M. & M. Co., 8 Nev. 219, 237; Watts-Campbell Co. v. Yuengling, 125 N. Y. 1, 25 N. E. 1060.

From all the facts and circumstances in this case it is clear to my mind that the lien was filed within 60 days after the last work was performed, and was in time. Salt Lake Hardware Co. v. Chainman M. & E. Co. (C. C.) 128 Fed. 509.

2. There is some controversy as to the claim in the lien for extras, $3,311.12. The record shows that when the original contract

was executed it was understood between the parties that, owing to the haste in making up the specifications, there would doubtless be some extras, which Mr. Richmond, on behalf of complainant, verbally agreed with the agent of defendant should not exceed $2,500. At the time of the first payment by defendant on the contract the agreement as to the extras not exceeding $2,500 was put in writing. In relation to the account for extras, it is alleged in the complaint:

"That after the making of said contract the said defendant caused sundry changes from time to time to be made in said specifications, including changes and removal of certain of the machinery and appliances furnished, after the same had been placed in position in said mill by your orator according to the original specifications. That in making such changes and alterations your orator furnished to said defendant, at its special instance and request, certain extra material not included in said original specification, consisting of rods, bolts, shafts, pulleys, couplings, pipes, nails, and other sundry appliances and material required in the erection, equipment, and installation of said machinery in connection with the said changes and alterations required by said defendant. That said extra material so furnished and used in and about the construction and equipment of said mill for the said defendant were and are of the reasonable value of $3,311.12"

The defendant answered:

"This defendant admits that it caused sundry changes to be made in the specifications, as alleged in the bill of complaint herein, and admits that the complainant in making such changes and alterations furnished to defendant extra material, as in said bill of complaint alleged; but denies that the extra material so furnished or used in and about the equipment of said mill for said defendant were or are of the reasonable value of $3,311.12, but, on the contrary, this defendant alleges that said extra material so furnished by said complainant made necessary by any change or changes in the specifications and used in or about the construction and equipment of said mill does not exceed the reasonable value or sum of $500."

Under these allegations in the pleadings there is but one question that can properly be raised as to the extras, namely, as to the value thereof. The agreement that the extras should not exceed $2,500 would not be a limitation upon any extras except such as were intended at the time such agreement was made.

In Salt Lake City v. Smith, 104 Fed. 457, 466, 43 C. C. A. 637, the court said:

"The dry words and broad stipulations of contracts must be read and interpreted in the light of reason and of the subject contemplated by the parties. The stipulation common to many corporation contracts that contractors may be required to perform extra work at the price named in the agreement or fixed by an engineer is limited by the subject-matter of the contract to such proportionally small amounts of extra work as may become necessary to the completion of the undertaking contemplated by the parties when the contract was made."

There were no false terms and conditions stated in the lien, or any fatal variance between the statements as therein made and the proofs given at the trial. There is no evidence that the recorded claim covers machinery and materials not properly included in the contract. The extras allowed were used by reason of alterations and changes made in the work under the contract, and this fact shows that no segregation is required to be made. The extras must

be considered as having been furnished under the terms of the contract by the express agreement of the parties thereto. The testimony, carefully considered, does not show that the extras constituted an independent contract. It is true that the right to enforce a mechanic's lien depends upon a compliance with the requirements of the statute. Technical accuracy, however, is not required. The courts hold that a substantial compliance is all that is essential.

In Springer Land Ass'n v. Ford, 168 U. S. 513, 524, 18 Sup. Ct. 170, 174, 42 L. Ed. 562, the court said:

"Although mechanics' liens are the creation of the statute, the legislation, being remedial, should be so construed as to effectuate its object. Davis v. Alvord, 94 U. S. 545, 24 L. Ed. 283; Mining Co. v. Cullins, 104 U. S. 176, 26 L. Ed. 704. Substantial compliance, in good faith, with the requirements of the particular law, is sufficient, and the test of such compliance is to be found in the statute itself."

In Skyrme v. Occidental Mill & Mining Co., 8 Nev. 219, 239, the court said:

"The statute in regard to mechanics' liens was intended by the Legislature as a protection to materialmen, contractors, and laborers, and lien claimants are required substantially to comply with its provisions in order to obtain the security which it affords. As was said in Putnam v. Ross, 46 Mo. 338: 'The whole course of legislation on the subject shows that it has been the intention of the Legislature to avoid unfriendly strictness and mere technicality. The spirit and purpose of the law is to do substantial justice to all parties who may be affected by its provisions.'"

The only variance between the lien as filed and the proof offered at the trial is shown by the record as follows:

| | | |
|---|---|---|
| Contract price | | $50,097 50 |
| Extras | | 3,311 12 |
| Total | | $53,408 62 |
| Credits | | 41,751 28 |
| Balance | | $11,657 34 |

The proofs show:

| | | |
|---|---|---|
| Contract price | | $50,097 50 |
| Payments thereon: | | |
| May 1, 1901 | $16,698 60 | |
| May 25, 1901 | 16,669 17 | |
| July 6, 1901 | 8,495 84 | |
| | | 41,863 61 |
| Balance due on contract | | $ 8,233 89 |
| Extras furnished | $3,311 12 | |
| Less material not used | 861 23 | |
| | | 2,449 89 |
| Balance | | $10,683 78 |

It will thus be seen that the amount claimed in the lien exceeds the amount proved by $973.56. This was fully explained at the trial. There was a clerical mistake in the aggregate credit, given in the lien at $41,758.28. The proof at the trial showed that this credit should have been $41,863.61, an error of $112.33. A clerical

mistake also is shown to have occurred in the item for extras by a failure to deduct therefrom the sum of $861.23, being the value of certain materials which were included in the contract, but not used. If mechanics' liens are to be construed so as to effect substantial justice, it cannot sensibly be claimed that a lien should be held void because it claimed a greater sum than was actually due, when, as here, it is evident that it occurred without any fraud or wrongful intent.

3. It is argued by defendant's counsel that two checks of $5,000 each, given by defendant on December 6, 1901, to Mr. Richmond, the manager of the machinery department of complainant, should have been credited as a payment on the contract. No such claim is made in the answer. It was shown by the testimony that the checks were paid to Mr. Richmond under a pressing demand for money, on an open account for machinery and materials purchased by defendant from complainant. This account has nothing whatever to do with the contract or the extras hereinbefore mentioned. In fact, there was never any controversy whatever between the parties as to the amount due on the contract. There was some confusion as to certain statements rendered by the complainant, which included the extras. The item of $3,423, referred to, included the sum of $2,449.89 extras, "and the excess of that amount was the unpaid amount of the open account." The whole matter as to the discrepancies is fully explained in the testimony. On June 25, 1902, complainant wrote to defendant:

"It came to the writer's attention that our bill for extras furnished during the construction of the mill had never been charged to the proper account. We are therefore charging your ledger account today with the amount of our bill for extras amounting to $2,449.89, and this amount will in the future appear on statements rendered you."

Thereafter, on August 19, 1902, complainant sent a statement to defendant, showing the total amount due on contract, extras, and open account $11,657.34, and on the 23d received a letter in reply, stating, "The directors appreciate the fact that this debt should be paid promptly." On November 5, 1902, counsel for complainant wrote a letter to the secretary of defendant, stating the amount due to be $11,657.34. On January 6, 1903, the secretary of defendant replied, stating:

"No one regrets more than our board that this small balance of so large and pleasant transaction with your clients should so linger, but, owing to the unfortunate management of last summer, it has thus lingered, and with a little more leniency on their part they will get all of their debt and interest without any trouble."

Other letters of like import were written by the respective parties. The defendant always admitted the debt to be due. The amount was never questioned in the correspondence. The difference between the amount due under the lien and the amount claimed by the letters arises from the fact that there was still money due on the "open account," which cuts no figure in this suit, except an open and frank admission that the debt proven under the lien claimed is justly due.

4. Counsel for defendant does not rely upon the "offsets" claimed in the answer, which are, in fact, possessed of no merit whatever, and will not be discussed.

5. Upon what property can the lien of complainant be enforced? This is the most important question involved in this suit. It is, in many respects, different from any other case to which the attention of the court has been called. In some of its features it may be said to be exceedingly close and uncertain. The answer must be given upon the facts, considered with reference to the express provisions of the statute.

(1) The claim of lien states:

"That all the above-mentioned work and labor was performed and all the above-mentioned material and machinery was used and installed and built and constructed into a mill upon the mine of said Chainman Mining and Electric Company, which mine is described as follows, to wit: 'Chainman Consolidated Lode Mining Claim,' designated by the Surveyor General as 'Lot No. 65,' consisting of the 'Chainman,' 'Chainman Gore,' 'Turkey,' and 'V' claims, especially the 'Chainman' and 'Chainman Gore' mines, upon which said mill and reduction work are constructed, and the Chainman mine mill site; also the electric plant house of said Chainman Mining and Electric Co., situated on lots 6 and 7 of Bk. '4' in Ely, Nevada, Lode Mining Claims, and the Chainman mill site—all being and situate in Robinson mining district, White Pine county, Nevada; together with mill, buildings, water rights, and machinery situate thereon and thereto pertaining, all being and constituting one single and indivisible mine, owned and worked as such by means of common shafts, tunnels, and excavations, and also by means of the mill, machinery, and other appliances, structures, and devices thereon and thereto pertaining."

The complaint copies the description as given in the lien. At the trial it was shown that the defendant, in addition to the consolidated group mentioned in the lien, owned an undivided one-half interest in a contiguous claim called the "Joanna," claimed to be a part of the "Chainman mine." It was also proven that the electric plant described in the lien and bill of complaint was situate in the town of Ely, about 2½ miles distant from the mine, and was run by water, known as the "Georgetown Water Right," owned by the Chainman Mining Company; that this electrical plant furnished the only motive power that the Chainman Company had for running the mill; that this power was not sufficient for operating the mill at its full capacity, there being only 78 horse power in the water right, and it took 90 horse power to operate the mill. The power was transmitted from the power plant to the mill by copper wire and pole line owned by the Chainman Company. It was also shown that the power for the mine hoisting works was steam, which was believed to be sufficient to operate the mill, but that the mill was not equipped for operating by steam power. It is claimed by complainant that the electric power and steam power were both necessary and required in the operation of the mine and mill. The complainant furnished no machinery or materials under its contract or list of extras for the electric light plant. What was furnished was on the open account between the parties, and for which they are not entitled to any lien. Mr. Richmond, in his testimony, said:

"At the time we commenced the installation of this machinery the Chainman Mining & Electric Company owned a power plant situated in the town of

Ely, which was equipped with a Risdon impact water wheel, which drove by belt connections a Westinghouse alternating current generator. The connection between the ditch, the water ditch, and the bars (?) was in very bad condition, and the efficiency of the Risdon water wheel was very low. I received an order from the Chainman Company to supply them with a new pipe line to supply this plant with water, and also with a new water wheel of the Pelton water wheel manufacture, which increased the efficiency of the plant so that they were able to utilize a certain amount of the power of this plant to drive a certain percentage of their machinery in their mill. * * * Q. Did any part of the material that you had contracted to furnish go into the electric light plant, two miles from the Chainman mine? A. Not in my original contract. My original contract only contained the electric motors which were to be used in conjunction with the electric power house. Q. Where were these electric motors installed? A. In the mill. * * * Q. Now, please tell the court what material, not included in your original contract, was furnished to the defendant company and installed by the complainant at * * * the defendant's electric light plant? A. I do not think that any of the materials that we furnished them for their electric power plant was installed by our men. I think they installed the material themselves. We furnished, however, a pipe line. and the water wheel which furnished the power to operate the generator. Q. You didn't have a contract to install that material, did you? A. No, sir; that was not in the contract. That was an open order. * * * The question of electric machinery was absolutely left out of my calculations until after I met with the directors of this company in the East, at which time they requested me to include in my contract the electric machinery they would require, so as not to have accounts with so many different people, and also as I had special freight rates into Ely, and I could take that machinery in probably cheaper than they could themselves."

It is shown by the deposition of Mr. Weller that all the work done on the power plant was for the Chainman Company, under the direction of Mr. Dunham, the general manager.

(2) The provisions of the mechanic's lien law (Cutt. Comp. Laws, § 3881 et seq.) having application to the question under consideration read as follows:

"Sec. 3881. Every person performing labor upon, or furnishing material * * * in the construction of any building or other superstructure, * * * and all persons who shall furnish any timber or other material * * * to be used in or about any such mine. * * * shall have a lien upon such, mine for the amount and value of the work or labor so performed, or material furnished."

"Sec. 3883. The land occupied by any building or other superstructure, * * * together with a convenient space about the same, or so much as may be required for the convenient use and occupation thereof, to be determined by the court on rendering judgment, is also subject to the lien, if at the commencement of the work, or of the furnishing of the materials for the same, the land belonged to the person who caused said building, improvement, or structure to be constructed, altered, or repaired."

"Sec. 3899. All foundrymen and boilermakers, and all persons performing labor, or furnishing machinery, or boilers, or castings, or other materials for the construction, or repairing, or carrying on of any mill, manufactory, or hoisting works, shall have a lien on such mill, manufactory, or hoisting works, for such work or labor done on such machinery, or boiler, or castings, or other material furnished by each respectively; and all the provisions of this act respecting the mode of filing, recording, securing, and enforcing the liens of contractors, sub-contractors, journeymen, laborers, and others, and the word 'superstructure', wherever it occurs in this act, shall be applicable to the provisions of this section of this act."

The property mentioned in the lien as the "Chainman mill site" should not be included in the decree. It is shown that it was

not upon any part of the Chainman mine, and has no connection whatever with the mill upon which the lien is claimed. The interest in the Joanna mine should also be excluded, because it was not mentioned in the description of property claimed to be subject to the lien. I am also of opinion that under the facts and the law the electric power plant, as described in the lien, should not be included in the decree.

This brings us directly to the question whether or not the lien can be enforced upon the entire group of mines described in the lien. The contention of defendant that, if complainant is entitled to a lien upon any ground, the same shall be limited to sufficient space around the mill as may be required for the convenient use and occupation of the same, namely, space for "dumps, tailings, supplies," etc., falls far short of giving the security which the lien laws contemplate should be given, and cannot be entertained. It is the duty of the court to consider the object and purpose of the parties in installing the machinery, constructing the mill and improvements on the property, in order to reach a proper interpretation of the law. The decisions cited by the respective counsel were based upon facts somewhat dissimilar from the case at bar. Some are founded upon the provisions of lien laws that are different in one state from another, etc.; others are dependent upon the rule established in various states as to whether the law should be construed strictly or liberally. But an examination of the cases will shed some light upon the general principles which are applicable to the question under discussion. The mechanic's lien law should be so construed as to protect lien claimants of whatever kind, whether contractors, machinists, materialmen, or laborers, in securing their claim. This at least should be one of the objects which courts should keep constantly in view. It is to secure this end that courts have held that the lien laws should be liberally construed with a view to effect their object and promote justice. In line with this principle, in Phillips v. Salmon River M. & D. Co. (Idaho) 72 Pac. 886, the Supreme Court of Idaho held, in a foreclosure of a laborer's lien upon a group of placer claims, that:

"Said three mining claims were being worked as one mine, and we think, under the evidence, appellant is entitled to a lien upon all of them, and the court erred in refusing to enter a decree foreclosing said claim of lien."

In Thompson v. Wise Boy M. & M. Co. (Idaho) 74 Pac. 958, 960, where a laborer at work as an amalgamator in a mill situate upon a quartz mine was held to be entitled to a lien on the mine, the court, in its opinion, said:

"If it be true that the mill was 'affixed to the mine, and was a part of the realty,' * * * then work in the mill was as much work in the mine as operating a hoist would be work in the mine. * * * The milling of the ore extracted from the mine is as valuable to the mine owner as the extraction of the ore; and where it is milled upon the mine, and in a mill belonging to the mine, we see no more reason for denying the man a lien who works in the mill than for denying such lien to the man who operates the hoist or runs the cars. * * * And we are very strongly inclined to the belief that the Legislature had the one in mind as much as the other when they enacted this law."

137 F.—41

In Keystone M. Co. v. Gallagher, 5 Colo. 23, 28, the court said:

"Blodgett's claim is for furnishing the material for and building a house or shop contiguous to the mine, and built for the use of the mine under the direction of the mining superintendent. The house was owned by the owners of the mine, and was a part of the mining property, and we see no error in the decree in favor of Blodgett and for the sale of the house, together with the mine, for the purpose of enforcing the lien."

In Williams v. Mountaineer G. M. Co., 102 Cal. 134, 142, 34 Pac. 702, 36 Pac. 388, it was held, under the lien law of California, that a claim of lien for materials furnished for the construction of a mill, tramway, boarding house, and reduction works upon a mining claim should be against the mining claim, and not against the specific structure upon the mine. In the course of the opinion, the court said:

"The mill is not a mere appurtenance for the mine. It is upon the mining claim, and, like the tunnels, tramways, and roads, is a part of the mine."

In Gould v. Wise, 18 Nev. 253, 264, 3 Pac. 30, 35, the court said:

"The last point made is that there was no testimony showing how much of the land upon which the reduction works stood was necessary for its convenient use and occupation. When the reduction works were leased, the land determined by the court as subject to the lien was embraced within the demised premises. And when the defendant acquired the property he purchased this land and the reduction works. This testimony showing that the land and reduction works had been leased together and sold together, tends to prove that the property subjected to the liens has been treated as a unit, and used for a common purpose."

In Springer Land Ass'n v. Ford, supra, the court had under consideration the construction of the lien law of Arizona, which gave a lien for labor performed or materials furnished in the construction of ditches, not only on the ditch and the land through which it was constructed, but on so much of the land about the same as might be required for its use, "to be determined by the court on rendering judgment." The suit was brought to foreclose a mechanic's lien upon an irrigating ditch and reservoir system, the land covered thereby, the right of way therefor, and the particular lands intended to be irrigated. The lower court rendered a decree allowing the lien on the ditch and reservoirs, together with the right of way, and also on 22,000 acres of land appurtenant to the ditch and to be irrigated thereby. The decree was affirmed. The Supreme Court, in the course of its opinion, said:

"The truth is that what area of land is subject to lien in a given case largely depends on the character of the improvement. The extent of ground proper and necessary to the enjoyment of a building, a wall, or a fence would not be the same as that required for or appertaining to an irrigation system, but the principle of determination is the same. This ditch was to expend its waters on this tract, and could not be used or operated without it. Each was dependent on the other, and both were bound together in the accomplishment of a common purpose. The lien must apply to the entire tract, or be confined to the right of way through which it took its course, and to narrow it down to the latter would be to disregard the very terms of the statute."

In view of the principles announced in these cases, and of all the facts established by the testimony; that the mill in question was erected upon the mining ground owned by the defendant; that

the object in view was the erection and construction of the mill for the purpose of working the ores that were to be extracted from the group of mines described in the lien; that the success and usefulness of the mill and of the mine were virtually dependent upon each other, and to that extent, at least, they were bound together for a common purpose—my conclusion is that the entire group of mines as mentioned in the lien and complaint should be held subject to the lien.

Let a decree be entered in favor of complainant in accordance with the views expressed herein.