UTAH CONST. CO. v. ST. LOUIS CONSTRUCTION & EQUIPMENT CO. et al.

(District Court, D. New Mexico. December 30, 1916.)

No. 116.

1. REMOVAL OF CAUSES ☞10—STATUS OF CAUSE AFTER REMOVAL—SUIT BY FOREIGN CORPORATION.

When the maintenance of an action commenced in a state court is prohibited by a state statute, because of the failure of plaintiff as a foreign corporation to comply with its requirements, plaintiff cannot better its position by removing the cause into a federal court.

2. CONTRACTS ☞284(2)—CONTRACT FOR RAILROAD CONSTRUCTION—CONDITION PRECEDENT TO RECOVERY—ENGINEER'S CERTIFICATE.

Where a contract for railroad construction made the chief engineer of the company the final arbiter of all disputes, and required his final estimate of the work done, and his certificate that it was free from claims for labor or material for which liens might be enforced before any right of action should accrue to the contractor, such certificate is a condition precedent to a right of action, or the contractor must excuse the failure to procure it by alleging and proving by direct and convincing evidence that in refusing it the engineer acted fraudulently, or so arbitrarily as to indicate fraud.

3. CONTRACTS ☞287(1)—CONTRACT FOR RAILROAD WORK—CONSTRUCTION—"FINAL SETTLEMENT"—"FINAL ESTIMATE."

Under a contract for railroad construction, providing that before final settlement the contractor should furnish evidence to the chief engineer of freedom from liens, and that the engineer should make and certify a final estimate of the amount due, which should be conclusive on both parties, "final settlement" and "final estimate" mean practically the same thing; a final adjustment of the account being necessary to the making of the certificate.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Final Estimate; First and Second Series, Final Settlement.]

4. CONTRACTS ☞284(2)—ACTIONS FOR BREACH—CONDITIONS PRECEDENT—ENGINEER'S ESTIMATE.

A provision of a contract for railroad construction, requiring a certificate of final estimate by the chief engineer as a condition precedent to a right of action by the contractor, cannot be ignored by the court.

In Equity. Suit by the Utah Construction Company against the St. Louis Construction & Equipment Company, the St. Louis, R. M. & P. Railway Company, and the Metropolitan Trust Company of

New York City, trustee, with the Bell & Levy Contracting Company as cross-petitioner. Bill and cross-bill dismissed.

POLLOCK, District Judge. This is an action to recover an alleged balance claimed by the plaintiff against the defendant St. Louis, Rocky Mountain & Pacific Railway Company, for construction work in building said railroad in New Mexico, and to enforce a mechanic's lien therefor. The Bell & Levy Contracting Company, a subcontractor, files a cross-petition to enforce a mechanic's lien in its favor on the corpus of the railroad for an alleged balance due it from the principal contractor. The Metropolitan Trust Company of New York City, trustee under a mortgage for the railroad, is made a party defendant.

[1] Among other defenses the defendant Railway Company pleads the following statute of New Mexico, in force at the time of making the contract in question, and yet in force:

"Every foreign corporation, except banking, insurance and railroad corporations, before transacting any business in this territory, shall file in the office of the secretary of the territory a copy of its charter, or certificate of incorporation, certified by the proper authority of the territory, state or county of its creation, and a statement of the amount of its capital stock authorized and in amount actually issued, the character of the business which it is to transact in this territory, and designating its principal office in this territory and an agent who shall be a domestic corporation or a natural person of full age actually resident in this territory, together with his place of abode, upon which agent process against said corporation may be served. * * * Upon the filing of such copy and statement, the secretary of the territory shall issue to such corporation a certificate that it is authorized to transact business in this territory, and that the business is such as may be lawfully transacted by corporations of this territory, and he shall keep a record of all such certificates issued."

"Until such corporation so transacting business in this territory shall have obtained said certificate from the secretary of the territory, it shall not maintain any action in this territory, upon any contract made by it in this territory."

"Every foreign corporation transacting any business in any manner whatsoever, directly or indirectly, in this territory, without having first obtained authority therefor, as hereinbefore provided, shall for each offense forfeit to the territory the sum of two hundred dollars, to be recovered with costs in an action prosecuted by the solicitor general in the name of the territory."

Laws 1905, c. 79, §§ 102, 103, 105.

The Construction Company and the subcontractor were foreign corporations of states outside of New Mexico, and the work to be done was on a railroad situated in said territory. The contractor did not comply with the requirements of the foregoing statute, but after the work was completed, and after suit was brought, it did attempt to comply with the statute.

As the suit was instituted in a territorial court of New Mexico, in 1908, where the principal pleadings were had, and the case was not removed therefrom into the United States District Court of New Mexico until 1912, which removal was made at the instance of the plaintiff, the federal court took the case as it stood at the time of removal, subject to the legal status and rights of the parties as they were established at the time of the removal. If the cause of action

had no right to exist in the jurisdiction where suit was brought, the plaintiff could not vitalize it by getting it transferred to another jurisdiction.

The cause must therefore be considered, in respect of the above provisions of the statute of New Mexico, the same as if the case now stood in the territorial court. We must therefore eliminate, as of any controlling effect, the ruling of the federal courts, of which the case of Lupton's Sons v. Auto Club et al., 225 U. S. 489, 32 Sup. Ct. 711, 56 L. Ed. 1177, Ann. Cas. 1914A, 699, is representative, wherein, under the New York statute, which declared:

"No foreign stock corporation doing business in this state shall maintain any action in this state on a contract made by it in this state unless prior to the making of such contract it shall have procured from the designated office the required certificate authorizing it to do business in the state"

—it was held that, inasmuch as the statute only prohibited the right to bring such action in the state court, it did not have the effect to prevent the nonresident contractor from bringing and maintaining suit in the United States court.

As the statute imposed no other restriction than a denial of the right to sue in the courts of the state, without imposing any penalty therefor, the Supreme Court held that such regulation of the state did not have the effect to deny the right of a citizen of a foreign state to resort to the federal court, when the requisite diversity of citizenship existed.

But the case at bar is where the plaintiff has sued in the local court to enforce a contract made without compliance with the statute, where the statute stigmatizes the dereliction of the corporation as an offense against the state and penalizes it. In this regard it is worthy of note the statute above quoted does not alone prohibit the bringing and maintaining of any action on a contract made in this state in violation of its terms, but it further provides as follows:

"Every foreign corporation transacting any business in any manner whatsoever, directly or indirectly, in this territory, without having first obtained authority therefor, as hereinbefore provided, shall *for each offense forfeit to the territory the sum of two hundred dollars, to be recovered with costs in an action prosecuted by the solicitor general in the name of the territory.*" Laws 1905, c. 79, § 105.

In such case there can be no doubt whatever but that the very business transacted by complainant and cross-complainant, the Bell & Levy Contracting Company, was prohibited by the act, hence unlawful, for which they might have been penalized in the sum of $200.

Mr. Benjamin, in his work on Sales (3d Am. Ed.) § 538, after reviewing at length the authorities, says:

"The propositions that seem fairly deducible from the foregoing authorities are the following: First. That, where a *contract* is prohibited by statute, it is immaterial to inquire whether the statute was passed for revenue purposes only, or for any other object. It is enough that Parliament has prohibited it, and it is therefore void. Secondly. That, when the question is *whether* a contract has been prohibited by statute, it *is* material, in *construing the statute*, to ascertain whether the Legislature had in view *solely* the *security and collection of the revenue*, or had in view, in whole or in part, the protection of the public from fraud in contracts, or the promotion of some object of public policy. In the former case, the inference is that the statute was

not intended to prohibit contracts; in the latter, that it was. Thirdly. That, in seeking for the meaning of the law-giver, it is material also to inquire whether the penalty is imposed once for all, on the offense of failing to comply with the requirement of the statute, or whether it is a recurring penalty, repeated as often as the offending party may have dealings. In the latter case the statute is intended to prevent the dealing, to prohibit the contract, and the contract is therefore void; but in the former case such is not the intention, and the contract will be enforced."

The above text appears to be amply supported by authority. See McMullen v. Hoffman, 174 U. S. 639, 19 Sup. Ct. 839, 43 L. Ed. 1117; Bartlett v. Vinor, Carthew, 253; Pittsburg Const. Co. v. West Side Belt Railroad Co., 154 Fed. 929, 83 C. C. A. 501, 11 L. R. A. (N. S.) 1145; Thorne v. Travelers' Insurance Co., 80 Pa. 29, 21 Am. Rep. 89; Johnson v. Hulings, 103 Pa. 498, 49 Am. Rep. 131; Stevenson v. Ewing, 87 Tenn. 46, 9 S. W. 230; Yount v. Denning, 52 Kan. 629, 35 Pac. 207; Holt v. Green, 73 Pa. 198, 13 Am. Rep. 737; Dillon v. Allen, 46 Iowa, 299, 26 Am. Rep. 145; Woods & Co. v. Armstrong, 54 Ala. 150, 25 Am. Rep. 671.

In McMullen v. Hoffman, supra, the court said:

"The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce * * * any alleged rights directly springing from such contract. In cases of this kind the maxim is 'Potior est conditio defendantis.' "

In the noted case, often cited with approval by the courts, of Bartlett v. Vinor, supra, Lord Chief Justice Holt said:

"Every contract made for or on account of any matter or thing which is prohibited and made unlawful by any statute is a void contract, though the statute itself does not mention that it shall be so, but only inflicts a penalty on the offender, because a penalty implies a prohibition, though there are no prohibitive words in the statute."

The Court of Appeals for the Third Circuit, in Pittsburg Construction Co. v. West Side Belt Railroad Co., supra, considered a somewhat similar right of a foreign corporation to maintain an action to enforce a similar contract to the one at bar without having complied with the provisions of the statute of the state of Pennsylvania. That statute, as here, required the foreign corporation, before doing any business in the state of Pennsylvania, to file a like statement, to establish an office, and to appoint an agent in the state upon whom service of process could be had, declaring it should not be lawful for any such foreign corporation to do any business in the commonwealth until it had filed in the office of the secretary of state the required statement and obtained from him the specified certificate. It then declared that—

"Any person or persons, * * * who shall transact any business within this commonwealth for any such foreign corporation without the provisions of this act being complied with, shall be guilty of a misdemeanor, and, upon conviction thereof, shall be punished"

—either by imprisonment or fine in the discretion of the court. The court said, inter alia, that:

"The weight of authority is to the effect that it is not absolutely necessary * * * to make such contracts void that the Legislature should in express terms, declare them so."

After quoting with approval the declaration of Lord Chief Justice Holt, supra, it was said:

"That rule in this state has been generally followed by the courts, especially by the Supreme Court of Pennsylvania, in a number of cases. The reason for the enactment of such statute it is said is expressed in the case of Delaware, etc., Co. v. Passenger Ry. Co., 204 Pa. 25, 53 Atl. 538, as follows: 'The purpose of the act is to bring foreign corporations doing business in this state within the reach of legal process.' This purpose is not accomplished by a registration of the corporation at the pleasure of its officers, or *when it may be to their interest to appeal to our courts*. The act is for the protection of those with whom it does business, or to whom it may incur liability by its wrongful acts, and nothing short of a registration before the contract that it seeks to enforce is made can give it a right of action. Any other construction of the act would violate its plain words and wholly defeat its object, by affording protection to the corporation and denying it to the public."

In the case at bar plaintiff, the subcontractor, made a contract to be executed in New Mexico. For years it engaged in the construction work of building a railroad in the territory, dealing with the people, prosecuting the enterprise, before asking leave of the territory, without designating a place of office, or an agent or person on whom legal process could be served, and not until after the business was all transacted, and suit was brought to enforce the contract in its favor, did it undertake to comply with the statute. There was then no occasion for obtaining such permit to transact its business.

The statute unquestionably contemplated that the statement filed with the secretary of state was as to business thereafter to be transacted in the territory, for it expressly stated that the statement should contain—

"the character of the business which *it is to transact* in the territory, and designating its principal office in said territory and an agent who shall be a domestic corporation or a natural person of full age, actually resident in this territory, together with his place of abode, upon which agent process against said corporation may be served, and the agency so constituted shall continue until some other agent is designated."

The certificate the foreign corporation is required to obtain from the secretary of the territory was in the nature of a permit to do business in the territory, and was necessarily prospective in its operation. It would seem to lead to a positive absurdity to give to the second provision of the statute the construction that such statement could be filed with the secretary of state and a certificate obtained from him after the business was all transacted, and then maintain an action thereon.

The Supreme Court of New Mexico has not construed this statute. By the removal of this case into this jurisdiction the plaintiff has prevented an opportunity for such ruling by the Supreme Court of New Mexico. The provisions of the New Mexico statute were taken from the statute of New Jersey, almost literally. The Supreme Court of the latter state in Wolf v. Lancaster et al., 70 N. J. Law, 201, 56 Atl. 172, held that a contract made by a Pennsylvania corporation for business done in New Jersey could not be enforced when the contractor had

failed to comply with the provisions of the statute in question, although the contractor subsequently did obtain such certificate from the secretary of state. The court said that the certificate obtained in November, 1902, was not sufficient, where the contract was made prior to 1902. The general rule is that, where the Legislature enacts the provisions of the statute of another state, the construction placed by the original state on the statute is presumably imported with it.

While frankly confessing the question here involved is not devoid of doubt, yet I may say, were it deemed necessary to a decision of the case, in the light of authority, I would be constrained to hold against the right of complainant and cross-complainant, the Bell & Levy Contracting Company, in the face of the statute above quoted, to maintain their suits. However, the concession of the railway company, made at the hearing, to permit complainant to have a decree for the amount of the contract price unpaid, as determined by the engineer of the railway company, impels me to give complainants the benefit of the doubt, and to proceed to decision of the remaining question presented.

[2] The second defense interposed by the defendant railroad company against this action is that it was prematurely brought, and cannot be maintained, because the chief engineer of the railroad company had not given the plaintiff any certificate of final estimate of the work done.

The contract for the construction work of the railroad is similar in every essential particular to that in the case of Choctaw & M. R. Co. v. Newton, reported in 140 Fed. 225, 71 C. C. A. 655. Briefly stated, that contract constituted the chief engineer of the railroad company the arbiter and umpire between the parties, to prevent dispute or misunderstanding relative to any of the stipulations and provisions of the agreement, as well as the performance of the contract by either of the parties. He was to decide—

"all such questions and matter; and he shall also determine, and set forth in the final estimate, the amount and quantity, character, kind, and classification of all work and materials performed and furnished by the contractor, * * * including all extra work and material; and his decision and determination as to any and all such questions, matters, and things, and in construing any of the terms and provisions of this contract, shall have the force and effect of an award, and shall be final, binding, and conclusive, to all intents and purposes, and in all places, upon the said parties thereto."

The contract also provided that the engineer should make monthly estimates of the work done, out of which said sums found due the engineer should retain 10 per cent. as a safeguard against mistakes and for protection.

The twenty-first section required the contractor to promptly pay all subcontractors, materialmen, laborers, and other employés as often as payments are made to it by the Construction Company, and it also authorized the company to retain from the payments such deficiencies due to employés and pay them. This was followed by the following provision:

"Before final settlement is made between the parties hereto for work done and materials furnished under this contract, and before any right of action shall accrue to the contractor against the company therefor, the said con-

tractor shall furnish evidence satisfactory to the chief engineer of the [Railway] Company that the work covered by this contract is free and clear from all liens for labor or materials, and that no claim then exists against the same for which any lien could be enforced."

Section 22 of the contract is as follows:

"Sec. 22. Whenever in the opinion of the chief engineer of the Railway Company this contract and all things herein agreed to be done by the contractor shall have been completely performed and finished according to the provisions hereof, and within the time herein limited, said chief engineer shall make and return a final estimate of the amount due to it therefor and remaining unpaid, and shall certify the same in writing under his hand, and the Construction Company shall within sixty days after the completion of the work aforesaid, and the return of said final estimate, pay to the contractor the full amount so found to be due it and remaining unpaid, including the percentage retained on former estimates as aforesaid, except as in this contract is otherwise provided. The procuring of such certificate and final estimate shall constitute a condition precedent to any right of action by the contractor against the company."

As this action was instituted without the plaintiff having obtained from the engineer the required certificate of final estimate, the question to be decided is whether or not the plaintiff has pleaded and shown by evidence sufficient reason or excuse for going around the engineer and asking the court to ascertain what the final estimate should be. As such ascertainment would, by the express provisions of the contract, lodge in the engineer prior to the right to bring suit, making his findings conclusive at law, most certainly it devolved upon the plaintiff to show both by its pleadings and evidence that the engineer, in failing or refusing to give such certificate, did so with a fraudulent intent, or acted so arbitrarily as of itself to indicate the fraudulent mind and purpose. Fraud in such cases cannot be supplied by mere epithets or denunciations of the disappointed party. The facts constituting the fraud must be fully alleged, and the proof must be so direct, cogent, and convincing as to fully satisfy the judicial mind. Suspicion is not equivalent to proof, and it ought not to be inferred from refined, metaphysical reasoning, or inference drawn by speculative minds. The proof should be tangible.

What are the facts alleged in the petition to excuse obtaining final estimate from the engineer before suit was brought? They are that the plaintiff had fully performed the contract, and was justly entitled to demand such certificate, and that the engineer, on request therefor, arbitrarily refused to give the same, for the reason that he had received notice from the subcontractor, protesting against giving such certificate of final estimate to the plaintiff, on the ground that the subcontractor had a claim against plaintiff for damages caused in delaying the completion of the work within the time specified in the contract; second, that the engineer refused to give such certificate of final estimate until the plaintiff should furnish him satisfactory evidence that the work was free and clear from all lines for labor or materials, and that no claim existed against the same for which a lien could be enforced.

What is the evidence upon which the court is asked to find that this refusal was tinctured with a fraudulent design? While this action of the engineer is characterized in the pleadings of the contractor and sub-

contractor as having been prompted by sinister, selfish motives, that the engineer was acting collusively with the railroad company to prevent or delay suit on the contract, we are unable to discover any tangible fact developed by the evidence to warrant the court in thus stigmatizing the conduct of the engineer.

Mr. Wattis, representing the Construction Company, testified that in January, 1907, he met Mr. Turner, the engineer, in Raton, and that his purpose of visiting Raton was to check up the condition of the business and endeavor to get a settlement; that this was about the 20th or 21st. He testified that the chief engineer had never furnished the Construction Company with final estimate.

"I went down to his office and spoke to him, and asked him for the final estimate, and was refused. His refusal was sort of evasive. I asked him why he should refuse to give final estimate, and told him our subcontractors were there, and we wanted to get a settlement with them. I said, 'We have finished the work;' and he said, 'Yes, you have finished the work, but I cannot give it to you; you have not settled with your subcontractors.' I said, 'We are ready to settle with them; that is the reason, I want this final estimate.' I said, 'We are not asking you for money; before we ask you for money, we will show you our subcontractors are paid.' He said, 'I understand some of them are going to file liens; then they won't take this estimate.' I said, 'We want to see what the estimate is; if it is not satisfactory, our company will be protected, and we will look after the liens.' He continued to refuse in that manner. After I laid down, the office was furnished with figures of some kind purporting to be quantities that had turned up. I suppose it was work done in January, 1907; it was not a summary of all the work that had been done. I think that the only data we have received from Mr. Turner, the chief engineer, is that contained in these monthly estimate sheets furnished the company from time to time and a subsequent sheet for work, part of which was done in January, 1907."

Mr. Turner, in reply, testified, in substance, that he met Mr. Wattis at Raton, just as he was going in or coming out of the post office, that they met just inside the post office door.

"Mr. Wattis said, 'So you refuse to give me a final estimate.' I said, 'Now, Mr. Wattis, I am perfectly willing to give you a final estimate when you have shown me that there are no liens or claims upon which a lien could be enforced, existing;' and he said, 'You refuse to give me a final estimate;' and I said, 'Now, Mr. Wattis, I am perfectly willing to give you a final estimate when you have complied with the conditions of the contract;' then he said, 'You lied.' And this is all the conversation that took place at that time. I had probably two or three conversations with him prior to this one. I told him I was perfectly willing to give him a final estimate, when he had shown me that there were no liens, or no claims upon which a lien could be enforced. Nothing was said in this conversation by Mr. Wattis, requesting me to furnish him estimates for work of the Bell & Levy Contracting Company. I did furnish them estimates for all work that was done by that company. The estimate furnished for September, 1906, contained all of the work done by that company. They should have had all of them by October 10, 1906. I did not make any changes after October, and told representatives of the Utah Construction Company there were no further changes in the Bell & Levy Contracting Company's quantities and classifications. As I recall it, that was in October, 1906. I think I told them in December, also."

From Mr. Wattis' own testimony it would appear that the chief engineer only refused to give him certificate of final estimate because he had failed to furnish satisfactory evidence that all liens or claims for which liens could be filed were satisfied; that monthly statements had

been made from which the work done by the subcontractor was ascertainable. His evidence is quite conclusive of the fact that there was no collusion between Mr. Turner and the Railroad Company to either prevent or delay the bringing of the suit by the contractor, as it is a fact that the representative of the Railroad Company asked Mr. Turner to give the final estimate. That was on the 24th of January, 1907. Of this Mr. Turner testified as follows:

"The general manager, Mr. Van Hooten, insisted that I furnish the Utah Construction Company with a final estimate, which I declined to do, as I did not consider that the Utah Construction Company had complied with their contract; but I informed the general manager that I would notify the Utah Construction Company that there would be no change in the estimates furnished, and I did notify that company."

The letter to the Construction Company was dated January 26, 1907, in which letter Mr. Turner advised the Construction Company that he had received written notice from the St. Louis Construction & Equipment Company, protesting against giving said final estimate now, saying that they had a claim for damages on account of work not being completed within the time and in accordance with the terms specified in the contract, and further said:

"As I understand the contract, such final estimate cannot in any event be given by me until you shall furnish satisfactory evidence that the work is free and clear of all liens for labor and materials, and that no claims exist against the same for which a lien could be enforced. This you have not yet done, and I understand that some of your subcontractors have not yet been settled with. I am ready at all times to give you any detailed information regarding portions of the work done by subcontractors, which you or they may require in order to make settlement."

As the contractor had all the monthly estimates on the work done by the subcontractor, and was notified by the engineer that no changes would be made therein, there was nothing to prevent the contractor from settling with the subcontractors. The Railroad Company was under no obligation to provide money to the contractor with which to pay any subcontractor, and it was under no obligation to adjust any matters of differences between them. The evidence shows that the contractor had been paid on monthly estimates, less the 10 per cent. withheld under the present contract, to be accounted for in the final estimate and adjustment, and that the amount of money so paid to the contractor was amply sufficient to pay the subcontractor what was coming to him. So there was no legal excuse for the contractor not settling with any subcontractor, and preventing the filing of a mechanic's lien later.

If it be answered that the engineer complained to the contractor of having been notified of a claim for damages on account of having delayed the subcontractor in its work, and assigned that among the grounds for withholding final settlement, and, conceding that no mechanics' liens would obtain therefor, yet, as a matter of fact, the subcontractor filed no mechanic's lien on such claim for damages, but did file such lien for the balance claimed on account of the work and materials furnished under the contract. That lien the contractor did not discharge before bringing this suit, and that lien is sought to be en-

forced by the cross-petition of the subcontractor. How, then, can this action be maintained in the face of the express provision of the contract that "before any right of action shall accrue to the contractor against the company therefor, the said contractor shall furnish evidence, satisfactory to the chief engineer of the Railroad Company, that the work covered by this contract is free and clear from all liens for labor or materials," and that no claims existed against the same for which any lien could be claimed?

[3] Counsel for plaintiff on argument placed stress upon the preceding language of said paragraph in the contract:

"Before final settlement is made between the parties hereto for work done and materials furnished under this contract."

With much refinement they have sought to attach to the term "final settlement" an office, in effect, which I think is inapplicable here. The final settlement is one thing, and obtaining the certificate of final estimate is another. Presumptively there must be an adjustment between the engineer and the contractor before the engineer could give the certificate of final estimate, and therefore they mean practically one and the same thing. When the engineer should make the final estimate of the work done, and certified as to the result, he is presumed to have made an adjustment with the contractor of the accounting between them. This must be so, as a certificate of final estimate is conclusive on the Railroad Company, and it must pay the amount so found by the engineer, the umpire, whose estimate binds both parties. Omaha v. Hammond, 94 U. S. 98, 24 L. Ed. 70.

"A certificate of an engineer, when sufficient in form, is conclusive evidence of the performance of the contract, which provides that the work shall be done to his satisfaction to be testified by a writing or certificate under his hand." McGuire v. Rapid City, 6 Dak. 346, 43 N. W. 706, 5 L. R. A. 752, 753.

In Illinois Surety Co. v. Peeler, 240 U. S. loc. cit. 219, 36 Sup. Ct. 323 (60 L. Ed. 609), Mr. Justice Hughes, speaking of the employment of the term "final settlement" in contracts for public transaction and account, said that term "has been used from the beginning to describe administrative determination of the amount due. * * *" The words "settled" and "adjusted" are taken to mean the determination in the treasury department for administrative purposes of the account and the amount due; and we entertain no doubt that in contracts like the one under consideration, so long and so frequently employed in contracts for construction work, it means nothing more than an adjusting of the account of credits and debits to arrive at the final estimate. As the certificate given by the engineer of what the final estimate is would conclude both parties, it would necessarily imply that the final settlement or adjustment of the accounting had been made between the engineer and the contractor.

Stress was laid by counsel for plaintiff on argument upon the case of Springer v. Ford, 168 U. S. 513, 527, 18 Sup. Ct. 170, 175 (42 L. Ed. 562). The distinction between the provisions of the contract there under consideration and the one here is so palpable as to hardly justify discussion. The court in that case held that Ford was excused from showing that the work was free from all danger of liens because of

the failure of the owners to pay him the amount of the final estimate. Ford's contract provided that—

"The amount due to the contractor under the final estimate will only be paid upon satisfactory showing that the work is free from all danger of liens or claims."

Whereas, under the present contract, there could be no amount due until the chief engineer was satisfied that there was no lien. Neither was Ford, under his contract, required to show to the satisfaction of the chief engineer that the work was free and clear from all liens as a condition precedent to the right to demand final payment. All he was required to show was "that there was no danger of liens on account of his failure to pay the subcontractor before he was entitled to receive payment." So that the contractor there was required to make his showing with respect to liens only before final payment; but in the case at bar the contractor was positively required to make such showing before final estimate and certificate therefor.

[4] Counsel for plaintiff and cross-petitioner make earnest appeal that, as all the parties concerned are before the court, this objection to the action brought should be waived, and the court proceed to final ascertainment of the actual amount owing to plaintiff and the cross-petitioner.

Bad precedents, like hard cases, are the quicksands of the law, and are sure to come up to plague the court. If conceded in this instance, why not in any other, where the express stipulation of the parties is that no action shall be brought to enforce such contract until the suitor had obtained from the chief engineer, the umpire, a certificate of the amount due and owing? Any such holding in this case would thwart the very object and purpose of such provision in the contract. It would invite dissatisfied contractors to go around the engineer, the sole arbiter of the parties, and compel the adversary, as in this case, to go into court with pleas and counterpleas, with accumulated costs, annoyances, and delays, the very conditions the contract sought to obviate; and, as in this case, when the controversy comes on for hearing before the court, the contractor presents an array of outside experts to criticize and controvert the estimates and constructions of the engineer, and thus by this indirect method substitute the opinions and estimates of outsiders for that of the engineer, who at the very outset of the contract, conditioning its execution, the parties consented should decide such matters, and this without the persuasive, convincing proof requisite in equity to show fraud and oppression on the part of the engineer to invite the interposition of chancery.

It must follow that the petition and cross-petition should be dismissed, unless the plaintiff will file its written consent herein of acceptance of the offer, made by counsel on hearing, that, rather than have future litigation over this matter, judgment might be entered against it for the sum of $———, which I understand is the amount of the balance due on the estimate made in the testimony of the engineer. This course was pursued in the case of Choctaw & M. R. Co. v. Newton, 140 Fed. 250, 251, 71 C. C. A. 655, which also directed the manner of estimating the allowance of interest on the claim, under a somewhat similar situation.